CHASEZ, Judge.
The petition of Dorothy Hill Monteleone, dated March 21, 1962, prayed for an award in damages which resulted to her residence at 412 Lake Avenue in New Orleans from the alleged negligent construction activity which took place across Lake Avenue from her home during the months of June, July, or at times shortly thereafter, in 1961. Named defendants were Boh Brothers Con *404 struction Company, Inc., Williams-McWil-liams Industries, Inc. and its insurer, Employers Group of Insurance Companies; Pittman Construction Company, Inc. and its insurer Bituminous Casualty Corporation and the Board of Levee Commissioners of the Orleans Levee District. Another Company and its insurer were named but were subsequently dismissed on joint motion and are not before this court.
On October 22, 1963 a supplemental petition was filed wherein it was alleged that Pittman Construction Company, Inc. caused their portion of the plaintiff’s damages between September of 1961 and August of 1962; that the damages caused by Boh Brothers Construction Co. Inc. occurred between June, 1961 and March, 1962, and Williams-McWilliams Industries Inc. contributed to her damages between March, 1961 and June 1961, and between August, 1961 and February, 1962. This petition also charged the Board of Levee Commissioners of the Orleans Levee District with responsibility regardless of any question of negligence.
A second supplemental and amended petition dated November 27, 1964 stated that “the acts of negligence hereinbefore alleged against the said Boh Bros Construction Company, Inc. took place during two periods of time, that is, between April 30, 1962 and June 28, 1962, and also between October, 1960 and September, 1961” and further alleged on information and belief that the negligence of this defendant took place over a continuous period between October, 1960 through July, 1962.
Boh Brothers Construction Company, Inc. excepted on the grounds of prescription. This exception was apparently never disposed of.
Issue was joined in this case and the Civil District Court transferred the case for hearing by the Commissioner for the Civil District Court for the Parish of Orleans pursuant to R.S. 13:1171. The Commissioner’s findings and opinion were favorable to the position of the defendants and he recommended judgment dismissing them from the plaintiff’s demands. Exceptions were taken to the Commissioner’s report by the plaintiff and argued before the Judge below.
The Court rendered judgment in favor of the defendants and against the plaintiff, dismissing the plaintiff’s suit, and gave the following written reasons for judgment:
“The Court has studied the record and find that it supports the report and conclusions of the Commissioner in every material respect.
“It is the Court’s opinion from the evidence presented that the plaintiff has. failed to prove by a preponderance of evidence that the alleged damage she sustained was the result of either the construction of the Orleans Marina by the Board of Levee Commissioners, Orleans. Levee District, or any negligence on the part of the several defendants.
“Further, the Court is of the opinion that if any of the alleged damage sustained by Mrs. Monteleone occurred during the period of the construction of the Marina that said damage was not a consequence of the construction of the Marina or the activities on the part of any of the defendants, but rather was the result of natural soil subsidence, traffic passing in front of her residence, the normal attrition of time, or other factors not shown to have been in any way related to the construction of the Orleans Marina or the activities of the several defendant contractors.”
As the reasons indicate, the construction activity complained of in this case was the erection of the Orleans Marina on Lake Pontchartrain.
There does not appear to be strict proof in the record of the Board of Levee Commissioners of the Orleans Levee District’s ownership of the property on which the Marina was constructed, but it seems to> *405 be a foregone conclusion among the parties. If this be the case, the alleged liability of the Board of Levee Commissioners stands on a different footing than that of the contractor-defendants and their insurors. The Levee Board as the owner of the property on which the Marina was constructed commissioned the work to be done. Unlike the burden of proof that must be borne by the plaintiff to establish the liability of the construction companies, negligence need not be proved in order to hold the Levee Board in damages. This is the effect of Article 667 of the Louisiana Civil Code as seen by our Courts. Selle v. Kleamenakis, 142 So.2d SO (La.App.1962).
In order to recover at all, though, the plaintiff bore the burden of proving that the damages sustained by her were at least caused by the construction activity alleged in her petition as amended. The Commissioner and the Court below concluded that the causality was not shown by a preponderance of the evidence, and our attention at the outset is directed to the correctness of this finding, taking into consideration that this is a fact finding which is not to be disturbed in the absence of manifest error.
The evidence established that Williams-McWilliams Industries, Inc. contracted with the levee board on February 15, 1961 for putting in sheet pilings which job was completed by May 12, 1961. On August 17, 1961 a second contract was entered into by Williams-McWilliams Industries, Inc. for anchoring the sheet piling with pole piles driven into the ground, capped with concrete, and cabled to the bulkhead. This contract was completed December 12, 1961. All of this pile-driving was done parallel to Lake Avenue or East-West.
Pittman Construction Company, Inc. contracted on September 22, 1961 and their work was accepted on June 20, 1962. Their work' was to construct the Harbor Master Building at the East end of the Marina and the wharves and piers and included the driving of a.few additional piles on the land side of the bulkhead.
Boh Brothers Construction Company Inc.’s contract was from April 30, 1962 through June 28, 1962 and their job consisted of paving the parking area and the street on Lake Avenue and the sewerage and drainage installation. June 28, 1962 marked the cessation of all construction. The procedure in these contracts was for work to actually begin within a short time after the contract was entered into.
The jobsite itself abutted Lake Avenue on one side, and Mrs. Monteleone’s property abutted the Avenue on the opposite side, parallel to a portion of the jobsite frontage.
The testimony indicates that no tests to measure the effect of vibration were ever conducted by anyone connected with the project. Mr. Willoz, the chief engineer for the Board of Levee Commissioners of the Orleans Levee District, testified that the jobsite was very muddy and rough because it was a dirt terrain. Mr. McNamara, the assistant chief engineer of the Board of Levee Commissioners also testified, and he stated that the sheet piles driven by Williams-McWilliams were forty feet in length and the piles driven under the second Williams-McWilliams contract on the land side of the bulkhead were from sixty to seventy feet long. These were driven in clusters generally running East to West across the jobsite. The clustered piles were in groups of four, two of which were angled toward Lake Avenue under the ground. Mr. McNamara stated that he could not recall feeling vibration when he saw these piles driven, but that he was five or six hundred feet away. Mr. Willoz did notice vibrations from the piles “right adjacent to it”. Both Mr. Willoz and Mr. McNamara testified to the various forms of equipment that the contractors had at the jobsite. Mr. McNamara also gave the distance from the plaintiff’s dwelling to the jobsite as 98 feet; from her house to the nearest timber piling as 148 feet; and to the sheet piling, 208 feet. Mr. McNamara had *406 occasion to inspect the plaintiff’s home and did see damage present to the residence.
A representative of Williams-McWil-liams Industries, Inc. testified that 170 timber piles, 65 feet in length, were driven by them under their second contract between the middle of September and the 4th of October, 1961. He and other representatives of the defendants testified to the work that was done and the equipment used in connection therewith. Also 1800 piles were driven on the water side of the bulkhead by Pittman Construction Company, Inc. We also point out that the Commissioner himself made an inspection of the plaintiff’s premises during the course of the proceedings.
Mr. Wayne Stoffle was tendered by the plaintiff as an expert on architectural work and construction in the area. He held a Bachelor Degree in Architecture and a Master of Architecture degree from M.I.T. and possessed some 24 years of architectural experience, including work on the Civil Defense Control Center which is in the same general neighborhood as Mrs. Monte-leone’s home. He testified that the subsoil in the area is poor in that it “will not sustain a rod with substance or compression.” Mr. Stoffle found damages to the Monteleone home, which were caused by excessive settlement, and he stated:
“In my opinion this was excessive settlement and it was caused by some external force that probably by (sic) the construction that was going on in the area — although all of the houses in New Orleans do have some settlement. I believe this was excessive due to the outside forces which forced unusual foundation movements and consequently caused external damage and internal damage in a short period of time which would never have been caused had there not been the activity in the area that there was.”
He also found that the plaster cracks he examined in the plaintiff’s residence were no more than six to eight months old at the time of his inspection of the premises, which was in August of 1963, and likewise for other damage, such as the separation of wall from the ceiling. Further, he indicated that it was his opinion that soil subsidence was the cause of damage, but that this in turn was caused by external forces. His definition of external force was as follows:
“I have used the term in my testimony of ‘external forces’ meaning some powerful force transferred to the soil or to the ground or to the earth such as a force caused by the explosion of dynamite which is the principal of the seismograph in oil exploration — it could also be defined as the rolling of a heavy truck across unstable ground in which vibrations are set up or external forces which make the ground move.
“The ground is generally composed of layers of different types of soil and these soils within certain layers will carry these external forces, some better than others, for instance, a rock will carry a sounding shock a great distance, the less cohesive the soil the less distance the shock waves will travel, and again I use the term shock waves in meaning external forces such as a truck or an explosion.”
Mr. Stoffle’s statement that the cracks in the home were only six to eight months old has the effect of undermining his testimony somewhat, since this would place it some time after the construction was completed, but is perhaps explainable by the fact, according to Mrs. Monteleone, that the house was still sinking and cracking at the time of her deposition, January 6, 1964.
In direct refutation of the opinion of Mr. Stoffle the defendant introduced Mr. Frank Foster, who graduated in Civil Engineering at Tulane University and was a licensed engineer, and who was qualified at the trial as an expert in structural engineering. He examined Mrs. Mon- *407 teleone’s home on April 1, 1964. The following excerpt summarizes his opinion:
“I concluded that the damage that I noted in the majority of instances was caused by settlement, normal settlement of the house due to the subsidence of the soil that supported the house.”
In reference to the cracks found in the plaintiff’s home, he concluded that they were old because the paint in the cracks were the same as the paint adjacent. In further support of his conclusions, it was brought out that Mr. Foster was familiar with the general area of the plaintiff’s home.
The testimony of Mrs. Monteleone established that her home was almost 20 years old at the time construction began, and a swimming pool and greenhouse had been added in 1959 or 1960.
With respect to the chronology of the appearance of various items of damages as related to the various construction activities, there is some confusion on the plaintiff’s part.
Mrs. Monteleone testified that at the end of 1960 everything was in good condition. On direct examination at the trial she stated that, in May or June of 1961, she noticed cracks and the sinkage of ground which she attributed to heavy equipment, pile driving equipment and trucks and bulldozers. She stated that she saw a light fall out of her ceiling fan and the dining room chandelier crack due to earth tremors. She testified to several repair bills: — to roofers, for the replacement of a heater, installation of sewerage and replacement of steps to the servants quarters, all done in February and March of 1962. Vibrations were noticed through May, June, July and were heaviest in October, November and December of 1961. Her first complaint of the activities were made in May 1961 to the Sewerage & Water Board who were involved in a project not sued upon here. The plaintiff described the following as damages from the construction activity:
“The house has sunk and shifted, the concrete tile and wooden front porch separated from the main building, the concrete walk has sunk and portions are cracked and the steps to the porch are cracked and the concrete steps to the side entrance are cracked and separated from the house and the concrete driveway and walk pavement around the house and to the garage are broken, the awning at the living room is cracked from the door frame, the door in the living room has sunk and the frame is separated from the wall, the dining room chandelier is broken and the windows can’t open and there are cracks in the butlery and the shelves are separated from the wall and cracked and there are cracks in the kitchen and the cabinets are separated from the wall and the tile is cracked on the sink and the hot-water heater is broken and — the main bedroom is badly cracked and in the bathroom the ceramic tile is separated from the wall and the mirror is separated from the wall and the window sill is separated from the wall and the plumbing is not operating properly.
“The hall door is cracked and won’t close and there are cracks in the den, the picture molding is separated from the wall and the side entrance door is sunken and the three floor furnaces are damaged and the floors throughout the house are wavy and buckling and the weatherboards on the outside of the house are separating. The shingles on the roof are broken and the garage steps and porch are separated from the main building and the steps are broken, the whole building is sunk. The swimming pool is sunk and the walk around the pool is badly cracked and the motor and pump are damaged and the concrete patio is broken and the concrete wall around the pool and patio is cracked and the pipes to the septic tank are broken and there is underground *408 damage in that area, but I can’t find it, I can’t find where it is broken, I just know it is broken.”
She also testified to the resulting inconveniences she suffered.
On cross-examination Mrs. Monteleone was confronted with her deposition, wherein she stated July 6, 1961 or shortly thereafter as being the time of her first damages. Damage to her sidewalk and driveway had been occasioned by the Sewerage and Water Board project not a part of this action (Boh Brothers Construction Company, Inc. was the contractor for the Sewerage & Water Board project and the Sewerage & Water Board compensated her for such damage).
According to the deposition, the next item noticed was the sinkholes which appeared in.her yard in the period from July through September, 1961, followed by the broken septic tank which she stated occurred when the sewerage was being put in. She attributed this to vibration, but spoke of the work being done by Boh Brothers Construction Company, Inc. at the time, which was under the Sewerage and Water Board contract. No written complaints were made to anyone except people connected with the Sewerage and Water Board contract until after September of 1961, and the plaintiff stated that it was January of 1962 before she complained to someone connected with the Marina project. The next items seen were damages to the walk around and up to the house, and the porch, which was separating from the main building. Then there were cracks in the house and the tile pulled away from the wall and several windows wouldn’t open. She couldn’t pinpoint when that last happened, but said it was in the fall of 1961. She said the vibrations were at their worst in May through • August and October through December, 1961. Damage to her swimming pool motor and the walk around the pool occurred in February of 1962. At the trial she said this was incorrect and that the damage to the walk occurred earlier. The damage to the brickwork at the side entrances of her house she thought probably occurred in 1962 but she later said she could not place it in point of time. After much uncertainty in the course of questioning, the plaintiff coucluded that the sinking of the residence’s foundations and the separation of the porch from the main part of the building occurred late in 1961 or early 1962. In her deposition the plaintiff did not remember when she first saw the plaster cracks in her home. She said the garage and servant quarters started leaning in the autumn of 1961. She stated that she didn’t think she sustained any substantial damage before October 1, 1961, and that the Sewerage and Water Board did not have the “heavy, heavy equipment that these other construction companies had.” but this heavy, heavy equipment was present in May, June, July, August, October, November and December, 1961. In the plaintiff’s mind, this heavy equipment was referable only to the Marina project. A one inch sinkage of the pool was noticed in December, January or February. The appearance of sink-holes in the yard was at another point placed at the latter part of 1961; she did not believe they occurred when the Sewerage and Water Board was present but could not say how long they were there. At the trial the plaintiff also contended that the damage occasioned to her sidewalk and part of her driveway was the only damage done by the Sewerage and Water Board.
She later stated at the trial that she could not remember when the damage caused by the Sewerage and Water Board occurred. She then states that, according to a repair bid, the septic tank was probably broken a few days before September 11, 1961. She maintained that heavy vibrations were present in May, June, July and August, 1961, but that damage was not immediately apparent. She noticed the cracks in her house in the latter part of 1961, but did not know when they started. Cracks appeared in the walkway around the swimming pool *409 but she could not say when. Again, the plaintiff states she did not notice sinkholes in her yard while the Sewerage and Water Board was present, and she also testified that the Sewerage and Water Board installed their sewerage before the construction of the Marina commenced. In her deposition though, she stated at one point that the Sewerage and Water Board was present around July and August, 1961 and the work on the Marina had commenced at that time. She offered the following as an estimate of her damages, compiled by her expert, Mr. Wayne Stoffle:
General Conditions, Bond and Insurance-$ 1,375.00
Demolition - 840.00
Shoring and Leveling- 1,500.00
Plastering - 4,620.00
Carpentry - 1,320.00
Painting - 1,880.00
Concrete - 2,050.00
Masonry - 450.00
Plumbing- 875.00
Floor Finishing .- 560.00
Fill and Grading- 530.00
Sod _ 1,000.00
Contingencies - 1,565.00
$18,565.06
Contractor’s Profit - 1,856.00
SUB-TOTAL $20,421.00
APARTMENT, GARAGE AND GREENHOUSES:
General Conditions, Bond & Insurance-$ 295.00
Demolition- 250.00
Shoring and Leveling- 500.00
Carpentry -- 1,025.00
Painting - 780.00
Plumbing- 150.00
Floor Finishing- 185.00
Masonry - 420.00
Contingencies - 330.00
$ 3,935.00
Contractor’s Profit- 393.00
SUB-TOTAL _$ 4,328.00 4,328.00
GRAND TOTAL -$24,749.00
We quote the following of the plaintiff’s testimony:
Q. “Is it a fair statement to say that the only person or corporation that you positively know caused damage to your premises and its improvements without any calculation is the Sewerage & Water Board, but as far as any other contractor or person in- *410 eluded in this suit you are unable to identify as to their causing any damage or to what particular damage was caused by anyone?
A. That’s correct.” ******
Q. “Would you clarify this for the Commissioner what you are talking about ?
A. Well, I didn’t understand the question and the way I answered it I know I didn’t understand the question but as far as anyone correcting the damage to my home it all took place after the Sewerage & Water Board had completed their work and I saw no damage to the house and then for a period after that this continuous work was going on out there and this continuous damage was occurring to my house but as far as that damage, I do not blame that on the Sewerage & Water Board, it started after the Sewerage & Water Board was out of there, they took care of the damage that they caused but the other damage that was done to my house was caused by this construction.”
In reaching his conclusions in this matter, the Commissioner found that the plaintiff herein did not prove with certainty the damage that she is alleged to have suffered as a result of the construction of the Marina, and dismissed the plaintiff’s claims for damages against the Board of Levee Commissioners of the Orleans Levee District. This record however reflects to us that some damage was suffered by the plaintiff herein as a result of the construction work carried on by the Board of Levee Commissioners and though all of her claims may not be provable or compensable, she is entitled to some measure of recovery.
The record however does not disclose to us the exact extent of the damage physically nor the cost of repair. The list of repairs submitted by Plaintiff which is quoted hereinabove has not been amply proved and we feel that the Plaintiff should be given an opportunity to prove the actual compensable damage she suffered as a result of the activities of the Board of Levee Commissioners’ construction of the Marina. Finding therefore that there is liability under Article 667 of the Civil Code by the Orleans Levee Board to plaintiff we are going to remand this matter for the purpose of permitting the plaintiff to prove her claim for damages against the Board of Levee Commissioners.
Insofar as the several contractors sued by the plaintiff herein are concerned, namely Boh Brothers Construction Company, Inc.; Williams-McWilliams Industries, Inc. and its insurers, Employers Group of Insurance Companies; and Pittman Construction Company, Inc. and its insurer, Bituminous Casualty Corporation; the record does not disclose that they were guilty of any negligence in the performance of their contracts and sub-contracts in the construction of the Marina involved in this litigation. That trucks may have been driven over rutted areas or in excess of the speed limit of itself is insufficient to support a finding of negligence.
In order to hold the contractors, of course negligence must be proved.
A recently decided case by this court, Myevre v. Boh Brothers Construction Company, La., 192 So.2d 859 (La.App.1966) stated the law with regard to the distin-guishment of the liability of the contractor from that of the landowner:
“The decisions of the Courts of Louisiana are uniform in holding that a contractor is not responsible for damages sustained by property owners in the vicinity of works being constructed unless the property owner proves by a preponderance of evidence that the negligence of the contractor was the cause of the damage. Loesch v. R. P. Farnsworth & Co., 12 So.2d 222 (La.App.1943); Beck v. Boh Bros Construction Co., 72 So.2d 765 (La. App.1954) ; Tadin v. New Orleans Public *411 Service, Inc., 226 La. 629, 76 So.2d 910. (1954).
“In the landmark case of Loesch v. R. P. Farnsworth & Co., supra, the adjoining property owner sought to hold the contractor responsible for damage to his property allegedly resulting from the construction of a telephone company building. The Court stated:
‘We are much impressed by a realization of the obviously unfair result which might be brought about should it be held that, under such facts as are shown here, a contractor might be held liable for damage sustained by nearby buildings. The contractor here had nothing whatever to do with the preparation of the plans and specifications without variation on his part (as is conceded). Therefore, if there is anything at all which justifies recovery from anyone, it is only the fact that because of the proximity of plaintiff’s building during the construction of the building for the Telephone Company, damage resulted to the former, not from the manner in which the work was done hut merely from the fact that the work was done at all. Why then should the contractor be held liable? * * *
‘Nevertheless, the granting of the permit or franchise authorizes the construction of the work, and it would be unfair to hold liable the contractor employed to do the work merely because in doing it legally and properly he has caused damage to adjoining property.’ 12 So.2d at 226. (Emphasis supplied.)”
The judgment dismissing the defendants, Williams-McWilliams Industries, Inc., Employers Group of Insurance Companies, Pittman Construction Company, Inc., Bituminous Casualty Corporation and Boh Brothers Construction Company, Inc. is affirmed. However, the judgment is reversed insofar as it dismissed the defendant, Board of Levee Commissioners of the Orleans Levee District from the demands of the plaintiff, and this cause is remanded to determine the extent and compensable value for such damages as the Board of Levee Commissioners is liable for under Article 667 of the Civil Code.
Affirmed in part, reversed in part, and remanded.